# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

EMILE MOREAU,

                                    Plaintiff,

        v.                                                    9:20-CV-124
                                                              (DNH/ATB)
SHERRY ELLSWORTH, et. al.,

                                    Defendants.

EMILE MOREAU, Plaintiff pro se
DAVID C. WHITE, Asst. Attorney General for Defendants.

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation by the

Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)

and Local Rules N.D.N.Y. 72.3(c).  In this civil rights complaint, plaintiff's remaining[1]

claims allege that defendants violated his First Amendment rights by interfering with

his mail and his access to courts, and retaliating against him for the exercise of his

constitutional rights. (Complaint ("Compl.") Dkt. No. 1).  Plaintiff also claims that two

of the defendants were deliberately indifferent to his medical condition in violation of

the Eighth Amendment. (*Id.*)  Plaintiff seeks substantial monetary relief. (Compl. ¶¶ 69-

70).

        Presently before the court is defendants' motion for summary judgment pursuant

---

[1] Plaintiff's complaint also contained claims relating to the alleged failure to process his
grievances and verbal harassment.  Such claims were dismissed without prejudice in the court's initial
review of this action. (Dkt. No. 8 at 23).  Plaintiff did not amend his complaint with respect to the
dismissed claims.  Plaintiff's request for injunctive relief was also denied in the court's initial order.
(*Id.*)

to Fed. R. Civ. P. 56. (Dkt. No. 43).  Plaintiff originally asked that the court deny the defendants' motion as untimely, or in the alternative, give plaintiff additional time to respond. (Dkt. No. 45).  Defendants filed a "reply," arguing that their motion was timely, but did not oppose giving plaintiff an extension of time to respond. (Dkt. No. 47.  The court denied plaintiff's request to deny defendants' motion as untimely and afforded plaintiff the additional time he requested. (Dkt. No. 48).  Plaintiff filed his papers in opposition to the defendants' motion on the merits, and the defendants filed a reply. (Dkt. Nos. 50, 53).

## DISCUSSION

### I.   <u>Facts and Procedural History</u>

On December 27, 2013, while confined at Green Haven Correctional Facility, plaintiff filed a section 1983 civil rights action in the United States District Court for the Southern District of New York ("Southern District"). (Compl. ¶ 2). *See Moreau v. Peterson*, No. 7:14-CV-201, Dkt. No. 2 (S.D.N.Y. Jan. 8, 2014) ("*Moreau* I").  In July 2015, the Southern District court dismissed the action and entered judgment for defendants. *See Moreau I*, No. 7:14-CV-201 (NSR), 2015 WL 4272024 (S.D.N.Y. July 13, 2015).  On July 10, 2015, plaintiff was transferred to Eastern Correctional Facility ("Eastern"). (Compl. ¶ 3).  In August 2015, plaintiff appealed the decision in *Moreau I* to the United States Court of Appeals, Second Circuit ("Second Circuit"). *Id.*; *see Moreau v. Peterson*, No. 15-2534, Dkt. No. 1 (2d Cir. Aug. 11, 2015) ("*Moreau II*").

On June 8, 2016, plaintiff was elected as the inmate representative to the Inmate Grievance Resolution Committee ("IGRC"). (Compl. ¶ 46).  Plaintiff explains that he

complained to IGP Supervisor, Francois about the way that another inmate's grievance was handled. (Compl. ¶ 47). Plaintiff claims that, since then, he was the subject of retaliation. (Compl. ¶ 48). Defendant Correction Officer Justin von der Heyde[2] ("von der Heyde") and IGP Supervisor Francois would no longer allow plaintiff in the grievance office or would write him a note to tell him not to report for work. *Id.* On August 4, 2016, plaintiff sent a letter to K. Francois, the IGP Supervisor and Sergeant B. Liefeld explaining that he was resigning from his position because a knee condition prevented him from traversing the stairs to the IGRC office. *Id.* (Dkt. No. 1-2 at 25). Plaintiff states that after he left his position, he tried to avoid "unnecessary contact" with defendant von der Heyde. (Compl. ¶ 50).

The Second Circuit affirmed the judgment in *Moreau I* on January 12, 2017.[3] Compl. ¶¶ 4-6; *Moreau II*, 672 F. App'x 119 (2d Cir. 2017). On January 27, 2017, the Second Circuit mailed the decision to plaintiff. Plaintiff claims that the mail room supervisor at Eastern, defendant Sherry Ellsworth ("Ellsworth"), did not deliver the envelope to plaintiff until February 21, 2017. (Compl. ¶ 26; Dkt. No. 1-1 at 8).

Plaintiff alleges that on February 10, 2017, he received an envelope with a

---

[2] In the complaint, plaintiff referred to this defendant as J. Vonderheyde. However, it is clear from the defendants' papers that the correct spelling of this defendant's last name is "von der Heyde," and the court will use the proper spelling herein.

[3] Although plaintiff alleges that the appeal was denied on October 27, 2016 and then affirmed after a rehearing, plaintiff is incorrect. Plaintiff filed his appeal, but then incorrectly made a "motion" to reverse *Moreau I*. (*Moreau II*, Dkt. Nos. 95). The Second Circuit denied the "motion" on October 27, 2016 because it was procedurally improper. (*Moreau II*, Dkt. No. 99). Plaintiff then made a motion for "rehearing" of Dkt. No. 99, which was denied on November 28, 2016. (*Moreau II*, Dkt. Nos. 105, 108). The appeal itself was not denied after a rehearing. The district court's decision was simply affirmed on January 12, 2017. (*Moreau II*, Dkt. No. 112) (published at 672 F. App'x 119 (2d Cir. 2017).

3

motion that he previously attempted to serve on the New York State Attorney General on January 10, 2017. (Compl. ¶ 21). Plaintiff claims that Ellsworth did not mail the motion, held it until February 10, 2017, and then returned it to Plaintiff "opened" in an envelope with an outdated 1994 U.S. Postal label from Springfield, Massachusetts. *Id*. The outside of the envelope included a notation that read, "found loose in mail." (Compl. ¶ 23). Plaintiff claims that the "goal" of defendant Ellsworth and her staff was to delay plaintiff's papers so that he missed his court deadlines, resulting in his continued incarceration. (Compl. ¶ 24).

On February 16, 2016, plaintiff states that he received a letter from the Second Circuit which was postmarked February 8, 2016 and which was opened outside of his presence. (Compl. ¶ 28). Plaintiff claims that he made a Freedom of Information Law ("FOIL") request to see the "log book" page for the date he received the mail and claims he discovered that the page was "falsified." (Compl. ¶ 28).

Plaintiff states that on February 16, 2017, he sent a "complaint" to the United States Court of Federal Claims. (Compl. ¶ 7). Defendant Ellsworth allegedly held the "complaint" for five days before she sent it to the court.[4] (*Id.*) On March 6, 2017, plaintiff received a letter from the Court of Federal Claims, dated February 28, 2017, returning plaintiff's papers because it was unclear whether plaintiff meant to file a "complaint" with the Court of Federal Claims or whether he meant to file his papers in the U.S. Supreme Court. (Compl. ¶ 9). Plaintiff states that his "correspondence" with the Court of Federal Claims took one month, when it should only have taken two

---

[4] Plaintiff states that the Court of Federal Claims received his papers on February 27, 2017. (Compl. ¶ 8).

weeks. (Compl. ¶ 10).

Plaintiff claims that on March 9, 2017, he sent the "complaint" to the U.S. Supreme Court. (Compl. ¶ 11). Plaintiff claims that Superintendent Lee[5] and defendant Ellsworth held the mail for four days before sending it. (*Id.*) Plaintiff alleges that on March 27, 2017, his "complaint" was returned to him by the Supreme Court, with a letter from the Clerk of the Supreme Court which "did not mention anything about plaintiff's claim," instead, it discussed a "petition for writ of certiorari," the time to file it, and informed plaintiff that any claims must first be decided by a Court of Appeals or by the highest State Court available for review. (Compl. ¶ 12). Plaintiff states that he did "exhaust" his remedies, and that the Court of Appeals did consider his claim. (Compl. ¶ 13). Plaintiff alleges that the letter from the Supreme Court indicated that the "Rules of Court" and a sample petition for writ of certiorari were inclosed, but those items were not attached when plaintiff received the papers. (Compl. ¶ 13).

Plaintiff believes that "here's what happened:" when he sent his "complaint" to the Supreme Court on March 9, 2017,[6] Superintendent Lee and defendant Ellsworth held the complaint until March 13, 2017, opened the envelope, removed plaintiff's

---

[5] Superintendent Lee is not a named defendant in this action.

[6] The court notes that later in the complaint, plaintiff seems to repeat the same claim with slightly different dates and facts. Plaintiff claims that on February 16, 2017, he sent his "appeal" in *Moreau II* to the U.S. Supreme Court. Plaintiff claims he was overcharged for postage and was "held" by defendant Ellsworth until February 23, 2017. (Compl. ¶ 30). However, plaintiff also claims that on March 19, 2017 (not March 9th as he claimed in ¶ 32), he sent his "appeal" to the Supreme Court, which he claims was held, opened, and replaced with "fake" papers before being sent to the Supreme Court. (Compl. ¶ 33). He repeats the allegation regarding the March 22, 2017 priority package which was sent to plaintiff by the Supreme Court, which plaintiff claims was again opened, and defendant Ellsworth replaced its contents with plaintiff's original papers, after falsifying the log book. (*Id.*) Plaintiff also repeats that he did not receive the package until March 27, 2017. (*Id.*)

complaint, replaced it with their own "different" papers, and sent the papers to the court. (Compl. ¶ 14). Plaintiff then alleges that on March 22, 2017, the Clerk of the Supreme Court sent plaintiff the "priority mail," which Superintendent Lee and defendant Ellsworth received on Friday March 24, 2017, opened the envelope, removed their "fake" documents that they sent to the court and the documents the court sent to plaintiff, replaced them with plaintiff's original complaint, and delivered the package to plaintiff on Monday March 27, 2017. (Compl. ¶ 15).

Plaintiff states that, on April 12, 2017, he received mail dated "10, 2017" from the U.S. Supreme Court, signed by Redmond K. Barnes. (Compl. ¶ 35). Apparently, the notice signed by Mr. Barnes stated that an in forma pauperis ("IFP") application, along with other IFP-related documents were enclosed in the mailing. (*Id.*) Plaintiff alleges that no such documents were included in the package that he received, and he claims that defendant Ellsworth removed them. (*Id.*)

Plaintiff claims that even after he was transferred out of Eastern,[7] he discovered more instances in which defendant Ellsworth interfered with his mail. (Compl. ¶¶ 36-37). On February 26, 2018, plaintiff sent a letter to the Appellate Division, Second Department inquiring about an action entitled *Moreau v. State of New York*. (Dkt. No. 1-2 at 4). Plaintiff claims that on March 3, 2018, the Appellate Division, Second Department informed plaintiff that his criminal appeal was denied in September of 2016 for failure to timely perfect the appeal. (Compl. ¶ 38). Plaintiff states that he never received any notice about the dismissal in 2016, while he was at Eastern. (Compl.

---

[7] Plaintiff states that he was transferred to Mohawk Correctional Facility ("Mohawk") on February 22, 2018. (Compl. ¶ 37).

¶ 39).  Plaintiff states that he requested a copy of the log book from Eastern for September 30, 2016,[8] which indicated that plaintiff received two letters, but he never received either of them.  Instead, plaintiff claims that defendant Ellsworth falsified plaintiff's signature and never gave the letters to plaintiff.[9]

Plaintiff alleges that on March 3, 2017, defendant von der Heyde threatened to "break plaintiff's neck if he saw [him] close [to] the Grievance Office." (Compl. ¶ 18, 51).  On March 8, 2017, plaintiff states that he got a "call-out" for an identification photograph, but that in order to go to that location, plaintiff would be required to have contact with defendant von der Heyde. (Compl. ¶ 52).  Plaintiff claims that he explained to the "ID" Officer that defendant von der Heyde was retaliating against him, and in order to avoid contact with the defendant, plaintiff would "wait in the Guardroom Floor" to avoid seeing the defendant.  Although plaintiff claims that the ID officer said "okay," plaintiff was keep-locked and issued a misbehavior report two hours later by defendant von der Heyde for failure to obey an order. (Compl. ¶ 52-53).

On May 8, 2017, plaintiff was scheduled to report to the Inmate Grievance Resolution Committee ("IGRC") office at 9:00 a.m. for a "callout."[10] (Pl.'s Ex. K) (Dkt. No. 1-2 at 49).  At 8:20 a.m., plaintiff informed Correction Officer Leone ("Leone")[11]

---

[8] In another part of the complaint, plaintiff claims that on September 30, 2016, the Second Circuit Court of Appeals sent plaintiff "mail" that he never received. (Compl. ¶ 40).

[9] Neither letter was from the Appellate Division, Second Department. (Compl. ¶¶ 39).

[10] These additional facts appear in Plaintiff's Exhibit K which is plaintiff's May 18, 2017 grievance. (Dkt. No. 1-2 at CM/ECF p.49).

[11] Officer Leone is not a defendant herein.

that he could not walk up the stairs to the IGRC office due to his knee condition.[12] (*Id.*)
Defendant von der Heyde verbally harassed Plaintiff with racial slurs and reported the
issue to defendant A. Black ("Black"), the Inmate Grievance Program Supervisor. (*Id.*);
(Compl. ¶ 59).

At 8:30 a.m., Black arrived and continued to abuse and intimidate Plaintiff. (Pl.'s
Exs. I, K) (Dkt. No. 1-2 at 36-37 (5/22/17 Letter to Sup't Lee), 50 (5/18/17 Grievance)).
Black stated that he "didn't give a damn about [plaintiff's] medical problems" and
directed plaintiff to go upstairs or "kill [him]self" because he wrote too many
grievances. (Compl. ¶¶ 20, 59-61; Dkt. No. 1-2 at 50).  Defendants von der Heyde and
Black gave Plaintiff a "direct order" to walk up the stairs. (Dkt. No. 1-2 at 50).  Plaintiff
claims that as he walked up the stairs, his left knee gave out, and he fell  down the
stairs, injuring his head, neck, shoulders, and legs ("the staircase incident"). (Compl.
¶ 62).  Plaintiff was taken to the infirmary for treatment, and as a result of the incident,
he was in physical therapy for over two months. (*Id.*)

The following issues remain after the court's initial review of the complaint:

(1)   First Amendment mail interference claims against defendant Ellsworth.
(2)   First Amendment access to courts claims against defendant Ellsworth.
(3)   Eighth Amendment deliberate indifference claims against defendants von
der Heyde and Black in connection with forcing plaintiff to go up the
stairs.
(4)   Retaliation claims against defendants Ellsworth, von der Heyde, and
Black.

---

[12] Plaintiff claims that he had a "flat pass medical order" and annexed two such passes as
exhibits to his complaint. (Compl. ¶ 59; Dkt. No. 1-2 at 40, 41). The passes are dated May 11, 2017
and June 22, 2017. (*Id.*)

## II.    **Summary Judgment**

### A.    **Legal Standards**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

9

**B.    Evidence Submitted**

Plaintiff attached a substantial number of exhibits to his complaint. (Dkt. No. 1-1 (Exs. A-E) and 1-2 (Exs. F-L)).  Defendants have attached exhibits to their summary judgment motion, including plaintiff's January 5, 2021 deposition (Dkt. No. 43-1 (Ex. A; the Declarations of Rachel Seguin and of defendants Ellsworth, Black, and von der Heyde (Dkt. Nos. 43-4 - 43-7)).  Although plaintiff has attached exhibits to his opposition papers, most of them are duplicates of the defendants' exhibits and include a copy of the complaint. (Dkt. No. 50-2 - 50-10).  I will discuss the facts contained in the exhibits as they are relevant to the court's analysis of defendants' motion.

## III.    Mail Interference

**A.    Legal Standards**

It is well established that "'the First Amendment protects an inmate's right to send and receive both legal and nonlegal mail, although prison officials may regulate that right if the restrictions they employ are 'reasonably related to legitimate penological interests.'" *Abreu v. Travers*, No. 9:15-CV-540 (MAD/ATB), 2016 WL 6127510, at *10 (N.D.N.Y. Oct. 20, 2016) (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989)).  Legal mail is entitled to greater protection from interference than nonlegal mail. *Id.* (citing *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir 2003) (citations omitted)).  In *Abreu*, the court noted that "[a] single instance of mail tampering that does not result in the plaintiff suffering any damage is generally insufficient to support a constitutional challenge." *Id.* (citing *Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir. 1975). *See also Ahlers v. Rabinowitz*, 684 F.3d 53, 64 (2d Cir. 2012) ("With regard

to legal mail, an isolated incident of mail tampering is usually insufficient to establish a constitutional violation.") (citation omitted).  An inmate must show that prison officials "regularly and unjustifiably interfered with the incoming legal mail." *Davis*, 320 F.3d at 351 (quoting *Cancel v. Goord*, No. 00 Civ. 2042, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001) (citing Washington v. James, 782 F.2d 1134,1139 (2d Cir. 1986))). "However, 'as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received.'" *Geneo v. City of New York*, No. 20-CV-2441, 2021 WL 2111817, at *5 (S.D.N.Y. May 25, 2021) (quoting *Davis*, 320 F.3d at 351 (citing *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

Inmates' suits, alleging unconstitutional opening of their legal mail without any showing of damages have been dismissed. *Abreu*, 2016 WL 6127510, at *10 (citing *Pacheo v. Comisse*, 897 F. Supp. 671, 681 (N.D.N.Y. 1995) (dismissing inmate's claim based on a single instance in which defendants allegedly opened his legal mail outside of his presence because "he has shown no prejudice as a result of the allegedly unauthorized opening"); *Walton v. Waldron*, 886 F. Supp. 981, 986 (N.D.N.Y. 1995) ("Existing precedent on an inmate's claim that his 'legal' mail has been improperly handled by prison officials requires a showing of harm."); *Gittens v. Sullivan*, 670 F. Supp. 119, 124 (S.D.N.Y. 1987), *aff'd*, 848 F.2d 389 (2d Cir. 1988) (holding that inmate's allegation that his legal mail was "interfered with on one occasion is

11

insufficient to state a cause of action given that the interference complained of did not affect plaintiff's access to the courts")).

## B.    Analysis

In this case, plaintiff alleges both improper opening and actual interference with his legal mail.  Unfortunately, plaintiff's misuse of legal terminology and incomplete statement of facts makes some of the issues more confusing.  The court has attempted to clarify the issues by researching the dockets of plaintiff's other federal actions in addition to reviewing the evidence presented by both plaintiff and defendants. *See Allah v. Murphy*, No. 9:14-CV-0438 (GTS/TWD), 2016 WL 4401069, at *6 n.11 (N.D.N.Y. May 16, 2016) (citing *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (citations omitted) (docket sheets are public records, "of which the court could take judicial notice.")), *report-recommendation adopted by*, 2016 WL 4386013 (N.D.N.Y. Aug. 17, 2016), *aff'd*, 699 F. App'x 41 (2d Cir. 2017).

Most of plaintiff's "interference" claims allege delay in either sending or receiving legal mail, based on plaintiff's opinion of how quickly the mail should have been processed.[13]  Some of plaintiff's claims allege actual tampering with the mail, including removing plaintiff's documents and replacing them with "fake" documents as well as falsifying log book entries.

The first part of the complaint alleges that, after the Second Circuit affirmed *Moreau v. Peterson*, 672 F. App'x 119 (2d Cir. 2017), plaintiff made several attempts to petition for certiorari which were tampered with by defendant Ellsworth.  Plaintiff's

---

[13] At his deposition, plaintiff conceded that he had never worked in a facility mail room. (Pl.'s Dep. at 69, 73).

allegations are not supported by the complaint, his own deposition testimony, or by the records of the action that he claims he was attempting to appeal.

Plaintiff alternately refers to the document that he sent to the Court of Federal Claims/Supreme Court as a "complaint" or "appeal." He claims that after *Moreau II* was decided, he sent a "complaint" to the Court of Federal Claims on February 16, 2017, but that on March 6, 2017, his papers were returned with a letter from the Clerk of the Court of Federal Claims. In conclusory fashion, he states that the correspondence took a month "when it should have taken about two weeks." (Compl. ¶¶ 7, 9, 10).

However, it is clear from the letter that plaintiff received from the Court of Federal Claims,[14] dated February 28, 2017, that plaintiff sent what he believed to be his appeal in *Moreau II*. The Court of Federal Claims sent the document back to plaintiff because it appeared that he meant to file the papers in the United States Supreme Court, and they were being sent back for him to do so. (Dkt. No. 1-1 at CM/ECF p.30). There is no indication that any delay was caused by defendant Ellsworth, and plaintiff only assumes this to be the case.

Plaintiff then claims that he sent the "complaint" to the United States Supreme Court on March 9, 2017, and that defendant Ellsworth "held" it for four days before she sent it out. (Compl. ¶ 11). Plaintiff states that on March 27, 2017, he received an "open priority envelope" from the Supreme Court which contained a letter from the Court Clerk. Plaintiff claims that the Clerk's letter did not address plaintiff's claims, rather,

---

[14] This letter is attached to plaintiff's complaint.

the Clerk referred to a petition for certiorari and explained how plaintiff should proceed if he intended to file such a petition.

Because the Clerk did not address the "claims" in plaintiff's "complaint," he assumed that defendant Ellsworth had opened his outgoing mail to the Supreme Court, replaced his documents with some unknown "fake" documents, sent those documents to the Supreme Court, and then when the court sent correspondence to plaintiff, intercepted that correspondence, opened the envelope, took out the "fake" documents and put plaintiff's documents back in the envelope before delivering the mail to plaintiff.

Plaintiff has attached the Supreme Court Clerk's letter to his complaint. (Dkt. No. 1-1 at CM/ECF p.42). The Clerk stated as follows:

> You may seek review of a decision only by filing a timely petition for writ of certiorari. The papers you submitted are not construed to be a petition for writ of certiorari. Should you choose to file a petition for writ of certiorari, you must submit the petition within the 90 day time limit allowed under Rule 13 of the Rules of this Court. A copy of the Rules of this Court and a sample petition for a writ of certiorari are enclosed.
>
> Your case must be reviewed by a United States court of appeals or by the highest state court in which a decision could be had. 28 U.S.C. 1254 and 1257.

(Dkt. No. 1-1 at CM/ECF p.42). Plaintiff claims that the Rules and the sample petition were not enclosed and accuses defendant Ellsworth of removing them. The complaint does not explain how plaintiff determined that defendant Ellsworth accomplished this. At his deposition, plaintiff did not sufficiently elaborate on how he concluded that

14

defendant Ellsworth either delayed or tampered with plaintiff's documents to the point of removing documents and replacing them with "fake" ones. (Pl.'s Dep. at 51-64).

During his deposition, plaintiff alleged that the correspondence from the Supreme Court was actually delivered to the facility on March 24, 2017, but was not given to plaintiff until March 27, 2017, which would have given the defendant time to tamper with the contents. (Pl.'s Dep. at 68-72). Plaintiff claims that his family was "tracking" the package, so he knew that it arrived at the facility on March 24, 2017. (Pl.'s Dep. at 69). However, even assuming that the package was delivered to the facility on March 24, 2017, defense counsel noted at the deposition that March 24, 2017 was a Friday. Plaintiff acknowledged that mail would not have been delivered to him on weekends. (Pl.'s Dep. at 72). Plaintiff's allegations about this particular correspondence are fanciful at best. It is inconceivable that defendant Ellsworth just happened to have "fake" papers to put in plaintiff's outgoing mail, keeping and replacing plaintiff's "real" papers when the package was sent back from the Supreme Court before it was delivered to the plaintiff.

Plaintiff apparently tried again to file, what he then referred to as a petition for certiorari in the United States Supreme Court. However, the document was sent back to him on April 10, 2017, noting various deficiencies, including the lack of a proper motion to proceed in forma pauperis ("IFP"). (Dkt. No. 1-1 at CM/ECF p. 43). In his letter, the Clerk of the Court indicated that plaintiff should "correct and resubmit as soon as possible,"[15] and plaintiff was given 60 days from the date of the letter to do so.

---

[15] The letter indicated that a proper form IFP application was enclosed. (Dkt. No. 1-1 at CM/ECF p.43).

(*Id.*)  Plaintiff's handwritten note at the top of the document states that the Superintendent and defendant Ellsworth opened the Clerk's mail and took the documents; thus, plaintiff could not "do the petition." (*Id.*)

During his deposition, plaintiff claimed that defendant Ellsworth and the mail room staff behaved this way to prevent him from complying with deadlines and keep him in prison.[16] (Pl.'s Dep. at 100).  Plaintiff testified that no one told him that, it was "just the way they behave." (Pl.'s Dep. at 101).  Defendant Ellsworth denies tampering with any of plaintiff's mail, and has submitted evidence showing that she was not working on April 12, 2017, the day that she is alleged to have tampered with the most recent correspondence from the Supreme Court.[17] (Ellsworth Decl. ¶ 16).

Plaintiff also claims that on February 10, 2017, he "received back a motion under Newly Discovered Evidence" that plaintiff had served on the New York State Attorney General on January 10, 2017. (Compl. ¶ 21).  Plaintiff implies that the motion was never sent to the Attorney General, that defendant Ellsworth held the motion for a month, and then placed it in a different envelope with the notation "found loose in the mail." (*Id.*)  At his deposition, plaintiff claims that this motion was also to be sent to the United States Supreme Court, and the newly discovered evidence would have proven his innocence. (Pl.'s Dep. at 94-100).  Plaintiff discussed his "newly discovered

---

[16] The court would point out that *Moreau I* was a civil rights action that had nothing to do with plaintiff's conviction, and the result of which would have no effect on the length of his incarceration. *See* Moreau I, *supra*, 2015 WL 4272024.  As discussed further herein, at the same time, plaintiff was proceeding with an application for a second or successive application for habeas corpus under 28 U.S.C. § 2254.

[17] Defendant Ellsworth also states that the log books show that plaintiff signed for legal mail on April 12, 2017. (Ellsworth Decl. ¶ 16).

evidence," but failed to answer defense counsel's question, asking how plaintiff knew

that defendant Ellsworth "held" his motion. (*Id.*)

The court notes that plaintiff's conclusory allegations are unsupported by any

evidence. Defendant Ellsworth states in her affidavit that she was on extended leave

until January 17, 2017, so she could not have "intercepted" or held anything that

plaintiff mailed on January 10, 2017. (Ellsworth Decl. ¶¶ 12-13 & Ex. D) (Dkt. No. 43-

5). In addition, a review of the docket sheet in the Second Circuit relative to *Moreau v.*

*Ercole*, No. 17-126 shows that on January 12, 2017, plaintiff filed a motion for

permission to file a second or successive habeas corpus petition. (Dkt. Nos. 1, 4 in 17-

126). Plaintiff's submission was 201 pages long, and it was signed on January 9, 2017.

(Dkt. No. 1-2, 4 in 17-126). Clearly, plaintiff's motion was not "held" or "intercepted"

by anyone in the mail room and was sent promptly to the Second Circuit, where it was

received only three days after plaintiff signed the document.[18] The motion was based

on what plaintiff described as "Newly Discovered Evidence." (*Id.*) The Attorney

General's Office appeared on February 7, 2017.[19] (Dkt. Nos. 23, 24 in 17-126). The

Second Circuit denied plaintiff's motion ***on the merits*** on February 8, 2017. (Dkt. No.

---

[18] Plaintiff attempts to argue that defendant Ellsworth returned from her extended leave on January 17, 2017 and somehow located his papers in order to hold them. Clearly, since the papers were filed in the Second Circuit on January 12, 2017, plaintiff's argument has no merit. It is unclear what plaintiff received "back" on February 10, 2017, but it is clear that his motion had already been decided, and defendant did not intercept or hold plaintiff's papers.

[19] The court notes that the complaint indicates that the documents that were "returned" to plaintiff were intended for the Attorney General's Office, and perhaps were the copies of the motion that he attempted to serve. However, it is unlikely that defendant Ellsworth, even assuming she had been working on the date in question, would have intercepted and tampered with one set of documents, while promptly sending the other set to the court. In any event, plaintiff has not shown that he was injured in any way by the defendant's alleged conduct.

26 in 17-126).

Defendant Ellsworth does concede that on February 16, 2017, a piece of plaintiff's legal mail was opened outside his presence in error. (Ellsworth Decl. ¶ 15). The matter was addressed with the mail room staff, and efforts were made to determine that such mistakes were not repeated. (*Id.*) There is no indication that plaintiff suffered any harm as a result of this single incident.

Plaintiff's complaint was vague, and neither his deposition, nor his response to defendants' motion have clarified or substantiated any of the conclusory accusations that he makes against defendant Ellsworth. To the extent that plaintiff claims that the defendant delayed his mail, there is no indication that plaintiff suffered any injury based on delays or that the delays were attributable to the defendant. The court will next examine the claim of denial of access to courts based on the same allegations.

## IV.    Access to Courts

### A.    Legal Standards

The United States Constitution guarantees prisoners a "meaningful right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 830 (1977). As the Supreme Court explained in *Bounds*, this right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828. However, "*Bounds* did not create an abstract, freestanding right to a law library or legal assistance," nor did it "guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions

to slip-and-fall claims." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). Instead, "the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.'" *Collins v. Goord,* 438 Supp. 2d 399, 415–16 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 355). "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

The courts have recognized two variants of claims for denial of access to courts: first, "forward-looking claims," where "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," and second, "backward-looking access claims," which cover "specific cases that cannot now be tried (or tried with all material evidence)" due to the actions of state officials. *Jean-Laurent v. Lawrence,* No. 12-CV-1502, 2015 WL 1208318, at *3 (S.D.N.Y. Mar. 17, 2015) (citing *Christopher v. Harbury*, 536 U.S. 403, 413-14 & n. 11 (2002)). "The Second Circuit has emphasized, however, that the viability of [backward-looking] claims is far from clear, pointing out that the [Supreme Court's] *Harbury* decision was careful not to endorse their validity." *Id.* (quoting *McNaughton v. de Blasio*, No. 14 Civ. 221, 2015 WL 468890, at *12 (S.D.N.Y. Feb. 4, 2015) (other citations omitted). Although the availability of a backward-looking access claim remains uncertain in this Circuit,[20] the existing case law suggests four elements:

---

[20]  *See Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) ("The viability of backward-looking right-of-access claims is far from clear in this Circuit . . .")

> First, the plaintiff must identify a nonfrivolous, arguable
> underlying claim. Second, the plaintiff must establish that the
> defendant took or was responsible for actions that hindered a
> plaintiff's efforts to pursue a legal claim. Third, the plaintiff must
> show that the defendant's alleged conduct was deliberate and
> malicious.[21] Fourth, the plaintiff must demonstrate that the
> defendant's actions resulted in an actual injury to the plaintiff.

*Jean-Laurent v. Lawrence,* 2015 WL 1208318, at *4 (internal citations and quotations omitted). What does remain clear is that such denial-of-access claims are "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Harbury*, 536 U.S. at 415; *see also Sousa*, 702 F.3d at 128 (citation omitted).

## B. Analysis

Notwithstanding plaintiff's attempts to show that his litigation was interrupted or his documents tampered with by defendant Ellsworth, there is absolutely no evidence showing that any of plaintiff's cases were adversely affected by the defendant's actions. Such lack of actual injury is fatal any claim of denial of access to courts. In fact, the evidence shows that plaintiff was able to litigate more than one case during the period in question. He was able to file a substantial motion for permission to file a second or successive habeas corpus petition. The denial of plaintiff's motion was due to its lack of merit and not due to any actions or omissions by defendant Ellsworth.

Plaintiff's attempt at filing a petition for writ of certiorari in *Moreau II* was not

---

[21] *But see Desmarat v. Artus,* No. 08-CV-977 (DNH/RFT), 2011 WL 1564605, at *7 (N.D.N.Y. Mar. 25, 2011) (questioning whether 'maliciousness' is a proper element of a backward-looking access to court claim, based on Second Circuit jurisprudence).

impeded by defendant Ellsworth, despite plaintiff's conclusory allegations.  It is clear
from the letters sent to plaintiff from both the Court of Federal Claims and later from
the Supreme Court, that any delays in filing were due to plaintiff's errors and not due to
interference from this defendant.  Thus, any claim of denial of access to courts may be
dismissed.

## V.    <u>Retaliation</u>

### A.    **Legal Standards**

To state a First Amendment claim of retaliation, an inmate must allege facts
plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the
defendant took adverse action against the plaintiff, and (3) there was a causal
connection between the protected conduct and the adverse action. *Holland v. Goord*,
758 F.3d 215, 225 (2d Cir. 2014)(citations omitted).  The court must keep in mind that
claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted
judicial intrusion into matters of general prison administration." *Faulk v. Fisher*, 545 F.
App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.
2003)).  In other words, we must examine prisoners' claims of retaliation with
"skepticism and particular care." *Rivera v. Goord*, 119 F. Supp 2d 327, 339 (S.D.N.Y.
2000) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).  Accordingly, a
First Amendment retaliation claim must be supported by "specific and detailed factual
allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly,* 794 F.3d
290, 295 (2. Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983),
*overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 (2002)).

In order to satisfy the final prong, "the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Cruz v. Grosso,* No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at *6 (N.D.N.Y. May 23, 2014) (citing *inter alia Colon,* 58 F.3d at 873). Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, including temporal proximity between the protected activity and the alleged retaliatory act, and statements by the defendant concerning his or her motivation.[22] *Cruz,* 2014 WL 2176256, at *6 (citing *Colon*, 58 F.3d at 872-73). However, temporal proximity alone is not enough to establish a causal connection. The Second Circuit has held that where "timing is the only basis for a claim of retaliation . . . an inference of retaliation does not arise." *Thomas v. Waugh,* No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at *15 (N.D.N.Y. Sept. 30, 2015) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001).

**B.    Analysis**

**1.    Ellsworth**

Based on the findings above, this court has determined that plaintiff has failed to show that defendant Ellsworth intentionally delayed or interfered with plaintiff's mail. Thus, plaintiff cannot establish the second prong of the test for a First Amendment retaliation claim. He cannot show that the defendant took adverse action against him, and his claims of retaliation have been made in "wholly conclusory terms." This finding is supported by plaintiff's testimony at his deposition, during which he could

---

[22] This court recognizes the existence of other factors, as discussed in *Colon,* applicable only when the alleged adverse action is the issuance of a misbehavior report.

not elaborate on the facts establishing the defendant's alleged interference with his mail. Thus, plaintiff's claims of retaliation may be dismissed as against defendant Ellsworth.

### 2.    von der Heyde

In his complaint, plaintiff states that defendant von der Heyde retaliated against plaintiff to "support" defendant Ellsworth's constitutional violations against him. (Compl. ¶ 17). This paragraph is followed by a variety of claims that defendant von der Heyde verbally harassed and threatened plaintiff with physical harm if he saw plaintiff near the grievance office. (Compl. ¶¶ 18-20, 51, 54). "'[V]erbal harassment and derogatory comments by prison workers aimed at an inmate, however unprofessional, do not rise to a level of constitutional significance, and therefore cannot constitute adverse action sufficient to support a retaliation cause of action.'" *Sanchez v. Shanley*, No. 9:20-CV-0648 (GTS/ML), 2021 WL 365912, at *3 (N.D.N.Y. Feb. 3, 2021) (quoting *Reed v. Doe No. 1*, No. 9:11-CV-0250 (TJM), 2013 WL 5441503, at *6 (N.D.N.Y. Sept. 27, 2013)).

Plaintiff does allege that on March 8, 2017, defendant von der Heyde issued a misbehavior report against plaintiff for failing to follow a direct order. (Compl. ¶ 51). Plaintiff vaguely asserts that he reported for an ID photograph and told another officer that defendant von der Heyde had been "retaliating" against him, so plaintiff was going to wait in "in the Guardroom Floor" to avoid any contact with the defendant. (*Id.*) Although plaintiff claims that the other officer told him that it was "okay," plaintiff was later issued a misbehavior report by defendant von der Heyde for failing to follow an

order. (*Id.*)  In the complaint, plaintiff states that he exhausted his administrative remedies, but does not clarify what he alleged in his grievance.

A review of plaintiff's exhibits shows that plaintiff filed a grievance on March 17, 2017, claiming that defendant von der Heyde was verbally harassing him, and ultimately filed the March 8, 2017 misbehavior report against plaintiff because "on February 27, March 1, and 6, 2017, I wrote [sic] grievance for tampering with my legal mails, and medical call-out harassment." (Pl.'s Ex. H) (Dkt. No. 1-1 at CM/ECF p.30). However, the grievances filed on the above dates were not against defendant von der Heyde, and the first grievance filed against defendant von der Heyde appears to have been written on March 17, 2017, more than a week after the defendant issued the misbehavior report in question.

While a plaintiff who "alleges retaliatory adverse action by one officer for a grievance filed against another officer . . . faces a heightened burden of establishing a causal connection," this does not necessarily bar a retaliation claim where there are indications of "a retaliatory purpose - i.e., that the [officer's conduct] was meant to penalize [the plaintiff] for bringing past grievances, and to dissuade future grievances." *Vincent v. Sitnewski*, 117 F. Supp. 3d 329, 338-39 (S.D.N.Y. 2015) (alterations and internal quotation marks omitted). *See also Henderson v. Vanderwerff*, No. 9:13-CV-1537 (MAD/CFH), 2016 WL 660921, at *4 (N.D.N.Y. Feb. 18, 2016).  In this case, plaintiff does allege that on March 3, 2017, defendant von der Heyde threatened to break plaintiff's neck if he saw plaintiff near the grievance office.  Thus, the court will not recommend dismissal based upon the fact that, until March 17, 2017, it appears that

plaintiff's grievances were against other officers.

However, it is well-settled that, even where plaintiff can make a showing of retaliatory motive, the defendant may be entitled to summary judgment if he can show that the alleged retaliatory action would have occurred even without the improper motivation. *Greer v. Mehiel*, 805 F. App'x 25, 29 (2d Cir.), *cert. denied*, 141 S. Ct. 136 (2020), *reh'g denied*, 141 S. Ct. 217 (2020) (citing *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The defendant bears the burden of making the showing that she would have taken exactly the same action in the absence of an improper motive. *Greer*, 805 F. App'x at 29 (citing *Scott*, 344 F.3d at 288). In this case, although plaintiff alleges that the March 8, 2017 misbehavior report was in retaliation for past grievances, he essentially acknowledged at least one of the charged violations–that he was not in an authorized location.[23] He was found guilty of that movement regulation violation charge after a hearing, and that finding was affirmed on appeal. (Pl.'s Ex. I) (Dkt. No. 1-2 at CM/ECF pp. 33-35). Thus, the allegedly retaliatory action would have been taken regardless of the retaliatory motive and may not be the basis for a First Amendment retaliation claim. Since all the other "retaliatory" actions allegedly taken by defendant von der Heyde were verbal harassment, plaintiff has failed to raise a genuine issue of fact regarding his First Amendment retaliation claim against defendant

---

[23] While plaintiff believes that he had an explanation for his conduct, he nevertheless admits that he was waiting in a place where he was not authorized to be. (Compl. ¶ 52). Plaintiff claims that the officer on duty told plaintiff it was "okay" to wait "in the Guardroom floor." (*Id.*) Plaintiff was found "not guilty" of violating a direct order, but was found guilty of the movement violation. (Pl.'s Ex. I).

von der Hyde.

### 3. Black

Plaintiff alleges that defendant Black, who is the Inmate Grievance Supervisor at Eastern, retaliated against plaintiff by issuing a misbehavior report against him charging him with, inter alia, falsifying documents, in retaliation for the grievance that he attempted to file against defendant Black in relation to the May 8, 2017 staircase incident.[24] (Compl. ¶ 68). Defendant Black has filed a declaration, stating that the misbehavior report that he filed on June 14, 2017 was filed solely because the plaintiff violated facility rules and was in no way retaliatory. (Black Decl. ¶ 9) (Dkt. No. 43-6).

Plaintiff claims that on May 18, 2017, he filed a grievance against defendant Black in relation to the staircase incident of May 8, 2017. Plaintiff has filed affidavits signed by three other inmates who state that they saw plaintiff place the grievance in the proper receptacle. (Compl. ¶ 66 & Pl.'s Ex. K, CM/ECF pp. 55-57). Plaintiff claims that when he did not receive a response from the Inmate Grievance Resolution Committee, he attempted to "appeal" the grievance to the Superintendent. (Compl. ¶ 64).

Defendant Black explains that, instead of an appeal, he received plaintiff's initial grievance on June 8, 2017, and determined that the grievance was untimely because it had been filed more than 21 days after the alleged incident. (Black Decl. ¶ 10 & Ex. B). A copy of the plaintiff's grievance, dated May 18, 2017, but stamped "received" by the IGRC on June 8, 2017 is attached to the complaint as Exhibit K. (Dkt. No. 1-2 at

---

[24] Plaintiff also claims that defendant Black prevented plaintiff from exhausting his administrative remedies in relation to the May 8th staircase incident as will be discussed below.

CM/ECF p. 49-52).  The last page of the document contains a form for the IGRC "response." (*Id.* CM/ECF p. 52).  The "Response of the IGRC" section is blank, and next to "date returned to inmate," plaintiff wrote "no date."  Next to Chairperson, plaintiff wrote "no Chairperson," and next to "IGRC Member decision," plaintiff wrote "no IGRC Member decision." (*Id.*)

In the space for the written basis for appeal, plaintiff explained that, on May 18, 2017 he "sent" his grievance against "A. Black who directed me to harm myself on May 8, 2017." (*Id.*)  The plaintiff wrote that since he had not received the IGRC decision, he was "appealing" to the Superintendent. (*Id.*)  The document is notarized on June 7, 2018. (*Id.*)  Then, plaintiff claims that, after defendant Black denied the grievance as untimely, plaintiff tried to appeal to the CORC, using a Department of Corrections and Community Supervision ("DOCCS") form upon which the Superintendent's decision is usually written. (*Id.* at CM/ECF pp. 53).

The top of the form is where the Superintendent writes the appeal determination, and the bottom of the form is the "Appeal Statement," which is the space where the inmate indicates that he wishes to appeal. (*Id.*)  Plaintiff completed both parts of the form himself, using the top part of the form as a space for additional explanation of the incident. (*Id.*)  At his deposition, plaintiff admitted filling out the form and argued that he should have been allowed access to the form in order to appeal the Superintendent's failure to decide. (Pl.'s Dep. at 90-91).

On June 14, 2017, defendant Black issued a misbehavior report based on plaintiff's improper use of the form, charging plaintiff with "false information,"

possession of an "unauthorized item," "counterfeiting," possession of "contraband,"

"possession of a facility document," and "impersonation." (Black Decl. Ex. A).  The

misbehavior report explains as follows:

> On 6/14/17, I received in the IGRC Box an envelope from
> inmate Moreau containing a fabricated and falsified
> Superintendent's Response form (2133).  The form used by
> inmate Moreau is an official NYS DOCCS document that he
> is attempting to portray as original, but it has clearly been
> altered by him.  The information contained in the
> fabricated/counterfeited document is false.  He does not have
> the permission of the Superintendent or myself to use this
> form in any such manner.

*Id.*  Plaintiff claims that he had no other way to appeal the failure of the IGRC and the

Superintendent to respond to his grievance and claims that this misbehavior report was

issued in "retaliation." (Compl. ¶ 68, Pl.'s Dep. at 93).

Defendant Black has filed a copy of the memorandum that he sent to the plaintiff,

dated June 8, 2017. (Black Decl. Ex. B).  In this memorandum, defendant Black

acknowledges that on June 8, 2017, he received plaintiff's grievance, which was dated

May 18, 2017 but was untimely because it complained about an incident on May 8,

2018.  The memorandum stated that plaintiff included a "fabricated IGRC response

form." (*Id.*)  The memorandum further reminded plaintiff that he could have asked for

an extension of time to file his grievance, but no request for such extension was

received with the untimely documents.[25] (*Id.*)  The court notes that, even though

---

[25] As stated above, for a short time, plaintiff was an IGRC member, and was thus presumably
was familiar with the rules and regulations of the grievance program.  At his deposition, plaintiff
testified that, in all, he had filed over one hundred grievances total, and had filed approximately 25-30
grievances at Eastern alone. (Pl.'s Dep. at 87).  In addition a review of the Seguin declaration and of
plaintiff's deposition shows that he filed a substantial number of grievances and was well aware of the

defendant Black mentioned the falsified IGRC response in his memorandum of June 8, 2017, he did not issue a misbehavior report until plaintiff filed the next altered document in an effort to "appeal" to the CORC on June 14, 2017.

Plaintiff uses the term "retaliation" very loosely in his complaint, and it is unclear what alleged conduct that he attributes to defendant Black is "retaliation" and which constitutionally protected activity is the alleged basis for the retaliation. Plaintiff's strongest argument[26] for retaliation against defendant Black, based on the facts in his complaint, is that the June 14, 2017 misbehavior report was in retaliation for the grievance that plaintiff tried to file against defendant Black, dated May 18, 2017.[27]

However, defendant Black has shown that he would have filed the June 14, 2017 misbehavior report against plaintiff in the absence of any retaliatory motive. It is clear from defendant Black's June 8, 2017 memorandum, that he believed that plaintiff had filed a late grievance without asking for an extension of time to do so and had already tampered with the IGRC form. He did not issue a misbehavior report until plaintiff disregarded the memorandum and filed a new "appeal," using a different form which he

---

procedures involved. (Seguin Decl.) (Dkt. No. 43-4).

[26] It is well-settled that the court must interpret a pro se plaintiff's complaint to raise the strongest arguments it suggests. *Gause v. Claude*, No. 20-CV-4148 (JMA/SIL), 2021 WL 25356, at *2 (E.D.N.Y. January 4, 2021) (citing inter alia *United States v. Akinrosotu*, 637 F.3d 165, 167 (2d Cir. 2011) (per curiam)).

[27] If the court assumes that plaintiff is also alleging that defendant Black attempted to prevent plaintiff from exhausting his administrative remedies, it is unclear if plaintiff claims that this conduct was in retaliation for past grievances against other officers. The May 18, 2017 grievance appears to be the first grievance plaintiff filed against defendant Black, and defendants argue that it is more difficult for a plaintiff to show that an officer retaliated against an inmate for a grievance that was directed at other officers. It appears from plaintiff's deposition that he is only using the allegedly "blocked" grievance as an excuse for failure to exhaust his remedies with respect to the staircase incident and the June 14, 2017 misbehavior report as the basis for his retaliation claim.

again altered.  The misbehavior report was issued because plaintiff insisted on violating the rules of which he was well-aware.  Such misbehavior report may not be the basis of a retaliation claim, and that part of the complaint against defendant Black may be dismissed.

## VI.    **Exhaustion of Administrative Remedies**

### A.    **Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules.  *Jones*, 549 U.S. at 218-19 (citing *Woodford*

*v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC").  N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility.  *Id*. § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC").  *Id*. § 701.5(d).  The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance."  *Id*. § 701.3(a) (Inmate's Responsibility).  There is also a special section for complaints of harassment.  *Id*. § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies.  *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)).  The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion

requirement.  *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016).  "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857).  Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still relevant.  The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability.  *Ross*, __ U.S. at __, 136 S. Ct. at 1858.  Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580.  An administrative procedure is "unavailable" when

> (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, __ U.S. at __, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply.  *Id.*  The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief.  *Id.* at 1859.  The second example is when the administrative procedure "exists,"

but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

### B.     Analysis

Defendants argue that plaintiff has failed to exhaust his deliberate indifference claim with respect to the staircase incident. As defendants note, using May 8, 2017 as the date of the incident, plaintiff had until May 29, 2017 to file a grievance and until June 22, 2017 within which to file a request, supported by a showing of mitigating circumstances, for an extension of time to file a grievance if the original deadline had passed. 7 NYCRR §§ 701.5(a), 701.6(g)(1)(i)(a). Defendants argue that, even though the grievance is dated May 18, 2017, plaintiff did not "file" the grievance until June 8, 2017, and he did not request an extension of time to do so. He opted instead to falsify documents in an effort to "appeal" the alleged failure to respond to his original grievance.

Plaintiff claims that defendant Black "blocked" his grievance by refusing to file it because it was late. Plaintiff also testified during his deposition that defendant Black prevented him from filing the grievance. (Pl.'s Dep. at 88). Although a little unclear in his testimony, plaintiff stated that

> [The Superintendent] said he never received it, as I just stated
> before, that . . . wasn't the way that I do to exhaust my
> administrative remedy. Then, if you go to the court, the court
> will deny you if you did not exhaust your administrative
> remedy, but I always get an argument for that.
>      If you banned me from exhausting my administrative

> remedies, you're not going to get to say it, you're going to use
> it, but it's not going to work.  You give the Judge and say
> what - - which one you pardon for your administrative
> remedies.

(*Id.*)   It is clear that plaintiff is well-aware that if a defendant "blocked" plaintiff's

ability to exhaust his administrative remedies, plaintiff could avoid the exhaustion

requirement.[28]  Plaintiff's opposition to the defendants' motion for summary judgment

clarifies his argument and specifically states that defendant Black "barred" inmates

from exhausting their remedies.[29] (Dkt. No. 50-1, ¶ 62).   However, plaintiff still admits,

even in his response to the motion for summary judgment, that he "had a hold [sic]

Form 2133, *he make a copy of it, without any superintendent's signature*, and on June

14, 2[0]17, he appeal to CORC. [sic] the non-decision of the superintendent."[30] (Dkt.

No. 50-1, ¶ 64) (emphasis added).

Plaintiff seems to argue that he is entitled to have "Form 2133" so that he could

appeal the "non-decision," and he did not falsify the document.  However, it is clear

that Form 2133 is only available if the Superintendent makes a decision, and plaintiff

appeals therefrom.  Defendant Black's June 8th memorandum to plaintiff clearly

explains that plaintiff could have submitted a request for an extension of time to file his

grievance.  He had plenty of time to do so.  Instead, plaintiff created his own problems

---

[28] The court notes that at the deposition, it appeared that plaintiff had some language issues. However, other parts of his testimony indicate that he was well-aware of case law, and his difficulty with English did not appear to impair his understanding of the issues in the case.

[29] Plaintiff may have slightly overstated his argument because he seems to allege that defendant Black barred all inmates from appealing their grievances. (Dkt. No. 50-1, ¶ 62-63).

[30] Plaintiff referred to himself in the third person in his memorandum of law.

by obtaining an old form, copying it, and attempting to submit his "appeal" when he was not appealing any determination and utilized the DOCCS form improperly.

After the Supreme Court decided *Ross*, the Second Circuit tackled the issue of "availability" of administrative procedures if a grievance is never filed, is never assigned a grievance number, and plaintiff has no notice of what happened to the grievance. *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016). In *Williams* the court found that the administrative remedy would be "unavailable," notwithstanding the regulations providing that an inmate may appeal "to the next step" if they do not receive a response within the required time limit, because the regulatory scheme was "so opaque" that "no reasonable prisoner" could use it. 829 F.3d at 124.

Appealing "to the next step" was only reasonably applicable if the initial grievance had actually been filed, and plaintiff did not receive a response. Then, the IGRC or the Superintendent's failure to respond was appealable "to the next step." *Id.* Because no reasonable inmate would have been able to determine how to use the procedure if the grievance had not been filed, the Second Circuit found that the administrative remedy was "unavailable," and the exhaustion requirement was excused.

In Williams's case, as in this case, the plaintiff contended that his grievance was not initially filed.[31] However, this case is distinguishable from *Williams* because receipt of the grievance was acknowledged by defendant Black in his June 8, 2017 memorandum to the plaintiff. In this memorandum, defendant Black specifically informed plaintiff that he needed to submit the late grievance together with a request

---

[31] The court assumes for purposes of argument that plaintiff in this case did mail the grievance on May 18, 2017.

for an extension of time to file.  If plaintiff had done so, an extension could have been granted, and plaintiff could have exhausted his administrative remedies.  Instead, adamant in his assertion that he had already filed the complaint and was appealing a "failure to decide," plaintiff took it upon himself to unsuccessfully and inappropriately devise a way to appeal.  Plaintiff was no stranger to the grievance process and simply chose to ignore the defendant's direction.  Thus, unlike the plaintiff in *Williams*, the administrative procedure was not unavailable, plaintiff simply chose to ignore it.  Thus, he cannot argue that defendant Black "blocked" his attempt at exhausting his administrative remedies, and plaintiff's deliberate indifference claim may be dismissed for failure to exhaust.

     **WHEREFORE**, based on the findings above, it is

     **RECOMMENDED**, that defendants' summary judgment motion (Dkt. No. 43) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY**.

     Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: July 15, 2021

Andrew T. Baxter
U.S. Magistrate Judge